INTERSTATE B. & L. ASSOCIATION v. OUZTS.

1. WHEN A BUILDING AND LOAN ASSOCIATION loans to a member one-half of the face value of his stock, and requires payment of dues on all the shares in settlement, it must account to him for the value of all the stock, especially when there is no by-law in force at time of making loan, authorizing other settlement.

2. BUILDING AND LOAN ASSOCIATION.—The loan in this case has been paid in full by profits on stock and payment on interest.

Before KLUGH, J., Edgefield, November, 1897.   Affirmed.

Action in foreclosure by Interstate Building and Loan Association *v.* J. P. Ouzts.   The Circuit decree is as follows: ·

In November, 1889, J. P. Ouzts became the owner, by subscription, of five shares of stock in the Interstate Building and Loan Association of Columbus, Georgia, in what is known as series No. 5.   By the terms of his contract of subscription he was required to pay $5 for admission, which carried his subscription of stock for one month, and the sum of fifty cents per month on each share until his stock should mature to the value of $100 per share.   W. H. Ouzts subscribed for ten shares of the said stock at the same time, and subsequently transferred his shares to J. P. Ouzts, whereby he became the owner of fifteen shares in all of said stock. In 1890, J. P. Ouzts applied to the said Building and Loan Association for a loan of $750, and the same being granted to him, on November 24, 1890, he executed his bond to the said association in the penal sum of $1,500, conditioned for the payment "to said association, at its principal office in the city of Columbus, Georgia, so long as it shall continue to exist, or as may be provided in its charter, by-laws, rules and regulations, of the sum of $12.75 monthly (of which the sum of $9 is for installments due on said shares of stock, and the sum of $3.75 as interest on the actual sum advanced to said Joseph P. Ouzts), to be paid on or before the 3d Wednesday of each and every month after this date (until) the stock borrowed on shall mature, and shall perform the covenants contained in the mortgage or other instrument of writing securing this bond; and if this bond be collected by suit, shall pay the additional sum of ten per cent. on the amount due as counsel fees, and shall stand to and abide by the charter, by-laws, rules and regulations of said association (and upon the final settlement with the association, it to retain as installments on said stock and interest no greater sum than the sum actually advanced, with interest thereon at the rate of eight per cent. per annum.")   To secure the payment of this

bond, he assigned his fifteen shares of stock to the associa-
tion as collateral security, and executed to it a mortgage of
the real estate set forth in the complaint, and subsequently,
by agreement with the association, he substituted for said
real estate, other real estate, also described in the
complaint, whereupon the lien of the mortgage, on
the first mentioned real estate was released. He
performed the obligations of his bond punctually by
the payment each month of the instalments of stock
and interest until December, 1895, when he stopped paying
the same, and has paid nothing thereon since. Thereafter
this suit was brought to foreclose said mortgage and for a
sale of the mortgaged premises, and the application of the
proceeds of sale to the payment of costs, taxes and such lia-
bility of the defendant upon the said bond as may be deter-
mined and ascertained.

The defendant denies that anything is due on plaintiff's
demand, pleads payment in full, and that the claim of plain-
tiff is usurious, and sets up a counter-claim for the forfeiture
by reason of the usurious interest which he alleges that plain-
tiff received. The counter-claim and the plea for usury can-
not be sustained under the recent decisions in this State.
Pursuant to an order heretofore made in the case, the master
has taken the testimony, and reported that the amount due
on the mortgage debt is the sum of $490.87, which finding
he bases upon a statement of the plaintiff made without ref-
erence to the contract between it and the defendant, and
unsupported by the terms of their agreement. In this
"statement" the plaintiff arbitrarily confiscates one-half of
the defendant's stock by dividing his shares into two classes;
one of which it calls "common" or "loan" stock, and the
other "premium" stock, and then cancelling the so-called
"premium" stock. The terms of the contract creating the
debt do not authorize such a proceeding, and there is noth-
ing in the evidence to show that the defendant has ever con-
sented to it. The defendant's contract is fully set forth in
the bond. By it he borrowed from the plaintiff $750, and

transferred his fifteen shares of stock, undivided, as a collateral security, and bound himself to continue to pay monthly his installments on said shares of stock as he had done before under the terms of his subscription, and also the interest at the rate of six per cent. per annum on the sum borrowed, until the stock borrowed on should mature. Under the by-laws of the association the stock was to mature when its reached the value of $100 per share. Upon maturity of the stock, the loan and interest being thereby fully paid, these shares were to be cancelled and thenceforth void. Under this last mentioned provision, if the defendant in this case had continued his payments until the maturity of his stock, his fifteen shares worth $1,500 would have been cancelled in payment of a debt of $750, upon which all the time he had been paying six per cent. interest. Such a contract would be unconscionable, and no Court would enforce it. The plaintiff association, doubtless, in recognition of this principle, has inserted in its bond the stipulation that upon final settlement it would retain no more than the sum borrowed and eight per cent. interest thereon. Such, then, is the contract between the parties, and upon it the defendant's liability must be ascertained. The "statement" by which the plaintiff claims a balance due it of $490.87 (which includes a fee of ten per cent. for its attorney) is not warranted by the contract, and must be disregarded. His liability will be the sum borrowed ($750), less the value of the collateral at the time when he made default, with interest at the rate of eight per cent. per annum. The date at which he made default is the third Wednesday in December, 1895, which, by reference to the calendar, is ascertained to be the 18th. Now what was the collateral, his fifteen shares of stock, worth at that time? It does not appear that the stock was put up in open market and sold. The building and loan association declares through the lips of its secretary and general manager that it is now the owner of the transfer, and seeks to burden the stock with enormous accumulations of dues and interest and fines. This cannot be allowed. The

value allowed by the association itself is stated to be the amount paid on the stock, with two-thirds of the profits earned added. It appears from the printed statement of the association for the year 1895, that the profits earned by this stock up to July of that year was $20.79 per share. This on fifteen shares would amount to $311.85, two-thirds of which would be $207.90. This is the nearest ascertainment of the profits which the data at hand admits of. The stock profit up to December, 1895, would be somewhat more, but it would be speculation merely to attempt to estimate it. Now the amount paid on each share was sixty cents a month, of which eight cents was applied to expenses and fifty-two cents to the loan fund. The amount paid on these fifteen shares to the loan fund up to December, 1895, not including the admission fee, which by the gratuity of the association to its stockholders was equal to one monthly instalment, was $561.60. Add to this the two-thirds profits, $207.90, and we have the value of the collateral by the association's own method of ascertaining it, $769.50, which more than pays the defendant's debt. The finding of the master is overruled, and it is ordered, adjudged and decreed, that the complaint be dismissed with costs.

From this decree the plaintiff appeals on the following grounds:

1st. Because his Honor, the Circuit Judge, erred in holding that the master based his finding of the amount due by the defendant to the plaintiff "upon a statement of the plaintiff made without reference to the contract between it and the defendant, and unsupported by the terms of the agreement."

2d. Because his Honor, the Circuit Judge, erred in holding in said "statement, the plaintiff arbitrarily confiscates one-half of the defendant's stock by dividing his shares into two classes—one of which he calls *common* or *loan* stock, and the other *premium* stock, and then cancelling the so-called *premium* stock."

3d. Because his Honor, the Circuit Judge, erred in holding that the "statement by which the plaintiff claims as balance due it $498.87 (which includes a fee of 10 per cent. for its attorney) is not warranted by the contract, and must be disregarded."

4th. Because his Honor, the Circuit Judge, erred in overruling the finding of the master as to the amount due by the defendant to the plaintiff.

5th. Because his Honor, the Circuit Judge, erred in so construing the contract between the plaintiff and defendant, under the charter, by-laws, rules and regulations of the plaintiff association, as to find that "the value of the collateral by the association's own method of ascertaining it, is $769.50, which more than pays the defendant's debt."

6th. Because his Honor, the Circuit Judge, erred in sustaining the plea of payment, and in dismissing the complaint on that ground.

*Messrs. Sheppard Bros.* and *W. A. Wimbush,* for appellant, cite: *This is Georgia contract, and must be construed according to Georgia laws:* 27 S. E. R., 274, 692, 947. The *two-share feature is fully established by Georgia Courts:* 46 Ga., 166; 63 Ga., 373; 54 Ga., 474; 79 Ga., 439; 52 Ga., 427; 96 Ga., 206, 803; 101 Ga., 417.

*Mr. N. G. Evans,* contra, cites: *Intention and meaning of parties to a contract must be ascertained from the terms of the writing and nature of transaction:* 79 Ala., 516. *By-laws adopted after loan cannot affect the contract:* 12 Rich. Eq., 124; 15 S. C., 462; 43 S. C., 121; 51 S. C., 428; 17 S. C., 637; 10 S. E. R., 1092. *Findings of fact by Circuit Judge only reversed when against preponderance of testimony:* 24 S. C., 354, 360; 23 S. C., 94. *Foreign law must be pleaded and proved:* 23 S. E. R., 152; 5 N. Y., 451; 1 Ill., 39; 64 N. Y., 639; 40 N. Y., 187; 91 U. S., 13; 15 La., 491; 8 Minn., 13; 3 N. Y., 20; 32 Cal., 55; 8 Bush., 397; 25 S. C., 34.

Feb. 8, 1899.    The opinion of the Court was delivered by
Mr. JUSTICE GARY.    The facts of this case are set forth
in the decree of his Honor, Judge Klugh, which, together
with the appellant's exceptions, will be set out in the report
of the case.

We will first consider whether the plaintiff had the right
to restrict the defendant in the participation of the profits
to the extent of those made by only one-half of his shares of
stock.    Neither the contract entered into between the par-
ties nor the by-laws of the association, of force when
the loan was made, conferred any such right.    By-
laws were afterwards adopted, in 1894, giving the as-
sociation the right to retire one-half of the shares of stock of
a shareholder, when a loan was made to him, but these by-
laws did not have the effect of destroying the right of this
defendant to one-half the number of his shares of stock.    The
appellant's attorneys, in their argument, thus set forth the
operation of the two-share plan: "The member desiring to
anticipate the ultimate value of his shares, receives from the
association an advance of $50 a share in full liquidation and
final redemption of the share.    The member undertakes to
pay interest at the rate of six per cent. on the sum actually
advanced, and to continue payments of dues until the share
matures.    The association, however, having redeemed the
share at $50, only undertakes to mature it to that value, and
when the share reaches the value of $50, the loan is repaid.
The effect of this transaction is strictly to reduce the ma-
turity value of shares loaned upon from $100 to $50; but
for the sake of convenience in the distribution of payments
and profits, and otherwise, one-half of the number of shares
loaned upon are treated as being practically dead; in other
words, the member in obtaining an advance is considered as
having converted the number of shares advanced upon into
one-half that number of loan shares.    It will be seen that
the effect is the same, whether the maturity value of the
whole number of shares advanced upon be reduced to $50, or
whether one-half that number of shares are allowed to stand

as of the full maturity value of $100. Under the plan adopted, the association, instead of maturing the full number of shares to the value of $50 each, undertakes to mature one-half of that number to the full value of $100. All profits which would be apportioned to the full number of shares are apportioned to half the number, so that the member actually receives on these shares the full benefit of all profits earned. The dues paid on the extra shares are distributed as profits to all participating shares in the series, so that the member receives his proportionate share of all such payments, whether made by him or by other borrowers. In this way, while the actual cost of the advance may be more or less than six per cent., depending upon the success of the association's business, no premium is paid by the borrower, If there is any lack of strict mutuality in the plan, it must inhere in the favor shown the borrower; in that, under the contract, he cannot be required to pay in the aggregate more than the sum actually advanced, with interest thereon at the rate of eight per cent." The plaintiff's testimoney shows that a series of stock was issued every month since the organization of the association. The following appears in the testimoney of Mr. C. E. Beach, the secretary of the association: "Q. The payments made by him, that would mature fifteen shares of stock, and the payments made by an investor, that would mature fifteen shares of stock, would be the same, would it not, except for the interest paid by the borrower? A. It would; the difference being that the borrower gets his money in advance." From this statement, and other circumstances in the case, the Court has reached the conclusion that a series is composed of both loan stock and investment stock. Such being the case, it is at once apparent that it would work a great hardship, to require a borrower to pay dues on all his shares of stock, and to allow him profits on only one-half thereof, while the non-borrower would be entitled to profits on all his shares of stock, especially when, as in this case, there was no such by-laws in

existence when the loan was made. The defendant was, therefore, entitled to profits on all his shares of stock.

We will next consider the manner in which the amount alleged to be due under the mortgage should be determined. It was the intention of the parties to the contract, that the defendant's indebtedness under the mortgage should be extinguished, whenever his payments of dues and the profits on his shares of stock equalled the amount of the loan with interest at the rate of eight per cent per annum. The plaintiff's testimony shows that the defendant made 72 payments on account of dues on his shares of stock, amounting to $648, and 60 payments on account of interest on the advance, amounting to $225. The Circuit Judge finds that the profits earned by this stock, up to July, 1895, was $20.79 per share, which on fifteen shares amounted to $311.83, two-thirds of which is $207.90. These three sums aggregate $1,080.90. The loan was $750. Interest at the rate of eight per cent. per annum, up to 18th December, 1895, when default was made, amounts to $304. These two sums aggregate $1,054. It thus appears that the defendant paid to the plaintiff an amount more than sufficient to extinguish his indebtedness. The Circuit Judge, therefore, properly dismissed the complaint.

These views practically dispose of all the questions raised by the exceptions, and render unnecessary a consideration of the additional grounds upon which the respondent relied to sustain the judgment of the Circuit Court.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.

Justices POPE and JONES *concur* in the result.